F I L E D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

02 JUL 22 PM 3: 00

U.S. DISTRICT COURT
H D OF ALABAMA

THOMAS B. GREEN,                    )
                                    )
        Plaintiff,                  )                              *KU*
                                    )
v.                                  )    CIVIL ACTION NO. 00-JEO-0094-S
                                    )
CARLISLE ENGINEERED PRODUCTS,       )
INC.,                               )                    **ENTERED**
                                    )
        Defendant.                  )                    JUL 2 2 2002

## MEMORANDUM OPINION

In this action, plaintiff Thomas B. Green (hereinafter "Green" or "the plaintiff"), a former

employee of defendant Carlisle Engineered Products, Inc. (hereinafter "Carlisle" or "the

defendant"), has asserted various claims stemming from harassment that allegedly occurred while

the plaintiff was in the employ of the defendant. Count One alleges that the defendant's conduct

constitutes negligence and/or wantonness. (Doc. 1, Complaint). Count Two alleges negligent

and/or wanton employment, supervision, and/or retention of the employee who harmed plaintiff.

(*Id.*). Count Three alleges a breach of a duty of good faith in the employment relationship it had

with plaintiff. (*Id.*). Count Four alleges a breach of a contractual promise to provide a work

environment free of harassment. (*Id.*). Count Five alleges misrepresentation, and reliance

thereon, that the defendant would provide a harassment free work environment. (*Id.*). Count Six

asserts that the defendant ratified the harassing conduct. The plaintiff seeks compensatory and

punitive damages, plus costs. (*Id.*). Presently before the court is the defendant's motion for

summary judgment as to all the plaintiff's claims. Upon due consideration, the court finds that

the motion for summary judgment is due to be granted.

## PROCEDURAL BACKGROUND

The plaintiff originally filed this lawsuit in the Circuit Court for Jefferson County, Alabama, on November 29, 1999. This action was thereafter removed from that court to this court on January 12, 2000. *See* 28 U.S.C. §1332(a). (Doc. 2). After discovery was completed, the defendant filed a motion for summary judgment, including a supporting brief and evidentiary submissions on January 9, 2002. (Doc. 43-45). The defendant also filed a motion requesting oral argument on the summary judgment motion. (Doc. 46). The plaintiff filed a brief and exhibits in opposition to the motion for summary judgment on January 29, 2002. (Doc. 48 & 49). The defendant filed a supplemental evidentiary submission and a reply brief. (Doc. 50 & 51).

## FACTS[1]

The plaintiff began working for Carlisle (formerly Johnson Controls, Inc.) on May 29, 1990, at a plant in Tuscaloosa, Alabama. (Def. Ex. E, p. 1).[2] Having degrees in accounting and finance, Green was hired to fill the position of controller. (Green Dep. at 6, 37).[3] The position was at-will and required Green to correct issues that developed in accounts payable and cost accounting. (*Id.* at 48, 115-16). With few exceptions, Green's personnel file illustrates general satisfaction with his performance as controller. (Def. Ex. E, 15-19).

After four years with Johnson, Green was promoted to plant production manager. (Green

---

[1] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998). Although the court has in many instances delineated the opposing position on certain events, that was done for completeness. The claims were viewed in a light most favorable to the plaintiff.

[2] The defense exhibits are found at document 45.

[3] Green's deposition is found at exhibit C of document 45.

Dep. at 37-38). A production manager is responsible for "all aspects of the production floor

. . . from scheduling the production to making the product. . . ." (*Id*. at 50). In his first year as a

production manager, Green was praised for his handling of financial concerns but received

criticism for not being "more active in developing and presenting timely corrective actions."

(Def. Ex. E at 20, p. 2). His evaluation also states that Green failed to set operational goals or

develop as a team player and leader. (Def. Ex. E at 20, p. 3).

On March 28, 1996, Green was rated "Less Than Full Performance" on an employment

evaluation form in the areas of "Interpersonal Skills/Leadership" and "Ownership/Commitment."

(Def. Ex. E at 21). Nevertheless, Green managed to achieve a rating of "Full Performance" in

the areas of customer satisfaction/total quality, initiative/execution, communication, job

knowledge, and planning/balance. On December 10, 1996, in a follow-up evaluation, Green was

praised for having corrected the concerns regarding "Interpersonal Skills/Leadership" and

"Ownership/Commitment." (Def. Ex. E at 22).

Green then served as interim plant manager for approximately five months. (Green Dep.

at 59). The plant manager oversees all operations in the plant. (*Id*. at 60). While serving as

plant manager, Green received no complaints but apparently was not subject to any of the

evaluations that were characteristic of his earlier positions. (*Id*. at 61-66). Green returned to his

his old position as a production manager when Carlisle hired Steve Golson (hereinafter

"Golson") to assume the plant manager's position. (*Id*. at 65). It is at this point, that Green

alleges a "campaign of harassment" began. (*Id*. at 65, 112-13).

Green states that Golson was verbally abusive and Golson's lack of physical control

constitutes harassment. Golson's conduct was erratic and abusive when issues arose regarding

3

productivity and costs. (Green Dep. at 182-186). Green describes the verbal abuse as Golson "losing control, temper, ranting, [and] raving." (*Id.* at 112). Golson also gave employees ultimatums such as "You will do this or you're fired" and was "short" with employees. (*Id.* at 112, 313). Golson stated at his deposition that he had a problem with Green's business performance and believes the defendant's responses to the problems, including the termination of Green for a "lack of satisfactory performance," were appropriate under the circumstances. (*Id.* at 117-19).

Green has outlined and alleged several specific incidents of purported harassment. In April or May 1998, Golson wrote a memo "insinuating" that Green and other employees acted unethically in failing to wash metal inserts that they had charged the customer for. (Doc. 49, Ex. 4, Def. Ex. 2, p. 2). Golson responds by pointing out that Carlisle was being paid to wash the inserts and, therefore, an intentional failure to wash the inserts was in fact unethical. (Golson Dep. at 19, 20).[4] Green states that the memo was inappropriate because Golson knew they were not washing the inserts. (*Id.*; Green Dep. at 139-51, 156-57). Golson "rant[ed] and rav[ed]" when discussing this situation with Green and other employees. (*Id.* at 157).

Green also complains that Golson cut his salary from 3.5% to 2.5% and became "livid" with Green when Green questioned his call for "action plans." (Doc. 49, Ex. 4, Def. Ex. 2). Golson admits that he did cut Green's raise from 3.5% to 2.5%. (Golson Dep. at 30). However, Golson claims that the cut was a result of a company "matrix" formula utilized by Carlisle to determine employee salary ranges. (*Id.*). That matrix, according to Golson, decreases the percentage of an employee's raise as the employee approaches the top of the salary range. (*Id.* at

---

[4] Golson's deposition is found at document 45, exhibit A.

4

30, 31).  With regard to the action plans, Golson states that he began requiring the action plans in order to help solve problems at the plant.  (*Id.* at 31, 32).  Green states that he believes that Golson's frustration was due to the fact that he (Golson) did not know what he wanted on the plans.  (Doc. 49, Ex. 4, Def. Ex. 2 at 2).

Green states that Golson "blew up" when the plant was shut without notification.  Golson was upset that he was not notified immediately.  Green attributed the problem to the fact that Golson was hard to locate and he did not carry a phone.  (Doc. 49, Ex. 4, Def. Ex. 2, p. 3). Golson was so excited he was "shaking" to the point that Green felt like he was "fixing to attack you."  (Green Dep. at 172).

Golson also decided to rotate people each day after the employees complained about work assignments.  When this did not work, he blamed Green for the rotation problems that were a result of his (Golson's) actions.  (Doc. 49, Ex. 4, Def. Ex. 2, p. 3).  Golson was "livid" with Green when they were discussing the problem.  (*Id.*).

Green also states that Golson told him to cut employee break minutes and increase the number of employees per team leader.  When they were discussing the plan, Golson started screaming, hitting the table, and told Green that he would be fired if he did not follow instructions.  (Green Dep. at 177-78).  When it did not work out, Golson blamed the failure on Green.  (Doc. 49, Ex. 4, Def. Ex. 2, p. 3; Green Dep. at 179).  Golson responds that Green did not have permission to take such actions.  (Golson Dep. at 41, 42).  According to Golson, the idea was discussed at a meeting but never formally reviewed before Green began implementing shorter breaks and increasing team sizes.  (*Id.*).  The review process is required and, therefore, Golson believes that Green was to blame for the problem.  (*Id.*).  Golson denies ever screaming

5

or yelling at Green after the incident. (*Id.* at 43).

Not long after accepting the job at Carlisle, Golson began looking for ways to reduce the number of temporary employees. He did this at the request of Kevin Early, Golson's immediate manager in Crestline, Ohio. (Golson Dep. at 44, 61). Green disagreed with any reduction and informed Golson. (Doc. 49, Ex. 4, Def. Ex. 2, p. 3). According to Green, Golson again "blew up" and reiterated his desire to reduce the number of temporaries. (*Id.*, Green Dep. at 185-86). Golson maintains that he was just doing what he was hired to do. (Golson Dep. at 45). This was one of the instances when Golson was yelling and screaming. (Green Dep. at 304). Green was afraid Golson "was fixing to hit [him]." (*Id.*).

Richard Elmore, another Carlisle employee, quit after Golson changed the vacation schedule. (Golson Dep. at 49). Golson was "very upset and started to blame Green" for Elmore's leaving. (Doc. 49, Ex. 4, Def. Ex. 2). Green informed Golson that Elmore said he was quitting because he could not stand working with Golson. (Green Dep. at 195). Golson acknowledges that it was his decision to change the vacation schedule that caused Elmore to quit. (Green Dep. at 49). Golson claims that he was trying to coordinate Carlisle's vacation schedule with the industry standard and customer needs. (*Id.* at 47, 48).

Green also recalled that Golson "blew up" in May over a "shutdown schedule" for July. (Doc. 49, Ex. 4, Def. Ex. 2, p. 4; Green Dep. at 306-07). He was insistent that they publish a schedule so the employees could make plans for the summer. (Green Dep. at 197-98). According to Green, publishing the schedule was "a disaster" and was not tried again. (Doc. 49, Ex. 4, Def. Ex. 2, p. 4; Green Dep. at 306-07).

In July or August 1998, Golson stated that "we" would start having performance graphs

6

at managerial meetings. (Green Dep. at 203-05). Everyone, except the Engineering Manager, thought Golson would supply the graphs for the meetings. When nobody brought graphs to the next meeting except the Engineering Manager, Golson got so mad that he began to shake. (Doc. 49, Ex. 4, Def. Ex. 2, p. 4). Golson admits that he can "get a little excited" and, when he does, "the corner of [his] lip quivers." (Golson Dep. at 55). Golson likens the response to a person who turns their eyebrows up or gets wrinkles in the middle of their forehead when angry. (*Id.*).

Green also believes Golson blamed inventory shortages on him for no good reason. (Doc. 49, Ex. 4, Def. Ex. 2; Green Dep. at 218). Golson maintains that the shortage was Green's responsibility despite Green's assertion that the shortage is an accounting issue. (Golson Dep. at 59, 60).

In July 1998, an issue arose regarding who would fill a newly created position at the plant, which was titled Inventory Control Manager. (Golson Dep. at 68, 69). According to Green, Golson had asked Annie Daniels to put in for the job. (Doc. 49, Ex. 4, Def. Ex. 2, p. 4). Daniels told people that Golson told her that she had the job if she wanted it. (Green Dep. at 277). Green found out about Golson's request, which Golson denies he ever made, and expressed his concern to Golson. (*Id.*). At this point, Golson "blew up," telling Green that he could offer the job to whomever he wanted to. (*Id.* at 278). Golson claims he was concerned because Green had promised the job to Richard Elmore despite the fact that Green had no power to do so. (Golson Dep. at 69). Furthermore, Golson felt that an additional person, Vicky Manderson, was more qualified for the job than Elmore. (*Id.* at 69, 70).

In an incident in August 1998, Golson was upset with Green over his (Green's) handling of a matter involving Manderson. (Doc. 49, Ex. 4, Def. Ex. 2, p. 4). Green acknowledged that

7

he should not have gotten upset about the matter and he handled the Manderson situation wrong. When he acknowledged this to Golson, he (Golson) calmed down.

In October 1998, Golson "blew up" because he did not understand the accounting principles that were being discussed. (Doc. 49, Ex. 4, Def. Ex. 2, p. 4). Golson contends that he did not blow up but simply encountered some resistance to his plan to change the accounting scheme. (Golson Dep. at 85).

In October or November of 1998, Golson completed Green's performance review and told Green that if things didn't improve, he would be fired. (Doc. 49, Ex. 4, Def. Ex. 2, p. 4). Golson denies making the statement; but acknowledges that he advised Green of his "marginal" performance which would have to be improved. (Golson Dep. at 86). Golson was "irritable" but did not exhibit any type of "tantrum" at this time. (Green Dep. at 308).

Golson conducted a survey in December 1998 to measure employee satisfaction and concerns. (Doc. 49, Ex. 4, Def. Ex. 2). Green maintains that, when the results came back negative, Golson became upset with the managers. (*Id.*; Green Dep. at 310).

In April 1999, Golson "chewed [Green] out" for distribution problems at the plant. (Doc. 49, Ex. 4, Def. Ex. 2, p. 5). Golson remembers being displeased with the issues but does not recall a confrontation. (Golson Dep. at 95).

In May 1999, Golson became angry when customers complained about the status of the plant and because of a lack of attention being paid to them. (Doc. 49, Ex. 4, Def. Ex. 2, p. 5). Green acknowledged that when one customer visited the plant, he was busy due to a personnel shortage and could not give the customer the requisite attention. (*Id.*). Golson says that a customer wrote him a personal letter regarding Green's conduct and that he spoke with the

8

managers as a whole regarding the complaint without mentioning Green specifically. (Golson Dep. at 98).

In July 1999, Golson allegedly told managers that, if costs did not come down, they (the managers) "would not all be there." (Doc. 49, Ex. 4, Def. Ex. 2, p. 5; Green Dep. at 348). Golson says this is true. (Golson Dep. at 103). The president of Carlisle had informed all plant managers, including Golson, that a failure to reduce costs could result in a closure of the plant. (*Id.*). Golson, therefore, was simply relaying information from upper management. (*Id.*).

Golson also "blew up" in July over excessive overtime and employee assignments (tool tryouts). (Doc. 49, Ex. 4, Def. Ex. 2, p. 5). Golson believes overtime costs were a major portion of the plant's problems. (Golson Dep. at 104). Given upper management's desire to reduce costs, Golson responded by requiring manager approval of overtime. (*Id.* at 105). With regard to employee assignments, Golson claims that certain employees were supposed to attend tool tryouts in Detroit. (*Id.* at 101). Instead, some employees were sending other employees. (*Id.*). Golson says he was merely trying to ensure the right person attended the tool tryouts. (*Id.*).

In August 1999, Golson "raised hell" over inventories and production issues. (Doc. 49, Ex. 4, Def. Ex. 2, p. 6). In a weekly managers' meeting, Golson specifically was upset regarding the inventory. When Golson commented that they did not have this problem the last month when Manderson was there, Green stated "that Vickie [Manderson] was forcing the numbers." (*Id.*). Golson "blew up saying that [Green] did not know what [he] was doing." (*Id.*). Green states that "[a]fter a short tare[, he] interrupted [Golson] an[d] assured him that [he] had forgotten more about inventories than Vickie would ever know and th[at] she didn't have a clew (sic) about what she was doing. [Green] then told [Golson] that if that was what he wanted though, [Green] would

9

do it that way even if it was wrong. (*Id.*). Golson states that Green, as materials manager, was responsible for inventory issues and when an inventory reflected a loss, Green would blame the problem on Vickie Manderson. (Golson Dep. at 107). Additionally, it was only after Manderson left that inventories got out of control. (*Id.*). Golson denies ever "raising hell" over these issues. (*Id.* at 110).

Golson also was "raising hell" with him over the phone one day over problems with a project involving Mercedes-Benz. (Green Dep. at 371-72). Golson was "cussing." (*Id.* at 372). Green further states that, on several occasions, Golson's aggravation produced a fear of imminent assault. Golson would begin shaking and slamming his fist into tables. (Green Dep. at 178). "You honestly thought he was fixing to jump on you." (*Id.* at 186). Green says that he did not report all of the incidents involving Golson to the company. (*Id.* at 192).

On May 11, 1999, Green was the subject of a critical review when a February evaluation reflected a variety of concerns regarding his performance. (Ex. E, Def. Ex. 24, 25). Another employee, Manderson, had complained about Green's conduct. (Green Dep. at 66). Manderson complained of a lack of direction, supervision, and support from Green. (*Id.* at 66-68). The performance review concluded when Golson told Green that his performance was not sufficient to meet the requirements of his position. (Golson Dep. at 90). Green explains Manderson's complaints by labeling her as a "high-maintenance" individual who complained on numerous occasions. (Green Dep. at 70).

Green received a termination memo on September 10, 1999, that cited performance issues as the reason for his release. (Ex. E, Def. Ex. 26). Those performance issues, which were outlined in the May 11, 1999 evaluation memo, were a lack of leadership, accurate reporting,

10

support, and communication. (Ex. E, Def. Ex. 25). Green's employment with Carlisle was terminated on September 30, 1999. (Ex. E, Def. Ex. 26 at 1).

Green states that a variety of employees at the plant expressed concerns regarding Golson's conduct. (Green Dep. at 123, 124).[5] In all, Green claims that, at various times, fourteen people complained to Carlisle about Golson's behavior. (Green Dep. at 123). Allison Zhang expressed fear of attending meetings when Golson was present because she was afraid "somebody was going to kill somebody in them." (*Id.* at 128). Green also asserts that Richard Elmore and Niki Bridges made negative comments about Golson in exit interviews. (*Id.* at 132).

Carl Alexander worked with Golson and Green and states that Golson continually raised his voice at various employees at the plant and became so angry that he would shake and pound things with his fists. (Doc. 49, Pl. Ex. 2 (Alexander Decl.)). Alexander states that the result was a stressful situation for all of the employees that dealt with Golson. (*Id.*). Alexander has received medical treatment that he asserts was a result of Golson's harassment. (*Id.*).

The defendant has a harassment policy. (Doc. 45, Ex. J). The policy statement, on every page, is labeled with a heading that reads, "SEXUAL HARASSMENT." (*Id.* at 63). However, the text of the policy is much more inclusive. It states, "Carlisle is committed to providing a harassment free work place. No form of harassment on the job, including sexual harassment, or harassment due to religion, race, national origin, physical condition or disability will be tolerated." (*Id.*). "Immediate action shall be taken against any individual who harasses another employee. Harassment includes, but is not limited to, any conduct in the work environment that

---

[5] While Green's statement concerning the remarks of other employees would normally be inadmissible hearsay, the statement is not offered or accepted to prove the truth of the matter asserted. Instead, it appears to be offered to show the effect on Green's state of mind and to illustrate the abusive nature of Golson's behavior.

11

is unwelcome." (*Id.* at 64). "Any employee who feels he or she has been harassed should inform

their manager, another member of the management team or their human resource representative

as soon as possible. A complete investigation will be conducted immediately." (*Id.* at 65).

"Carlisle does not condone and will not tolerate any type of harassment. An employee who

harasses another employee or business guest will be subject to disciplinary measures up to and

including termination." (*Id.* at 66). It further states, "If you believe you are being harassed, or

you observe another employee being harassed, your responsibility is to report it to your

immediate supervisor or the local Human Resources representative **promptly**." (*Id.* at 67). The

policy also sets out Carlisle's responsibilities, which are: To "[p]rovide a productive, harassment

free work place," "[i]nvestigate all complaints," and "[d]iscipline all offenders." (Doc. 45, Ex. J

at 68). The policy then describes employee responsibilities: "Do not harass other employees or

business guests" and "Report any incidents of harassment that you observe or are subjected to."

(*Id.*).

Green states that, although complaints regarding Golson were lodged with Carlisle and

Carlisle was aware of the harassment, nothing was done in response. Peggy Herron (hereinafter

"Herron") has been the Human Resources manager at Carlisle of Tuscaloosa since 1992.

(Herron Dep. at 5).[6] Herron is responsible for ensuring that employees are properly trained on an

annual basis to deal with and prevent harassment. (*Id.* at 10). She states that Carlisle's

harassment policy relates "mostly to sexual harassment" but fails to state what sorts of

harassment are covered other than sexual harassment. (*Id.* at 11). She does believe that the

---

[6]The Herron deposition is located at document 45, exhibit B and contains page numbers that are located
inside the last letter of the heading on each page.

policy is not relative to yelling or "anger type things." (*Id.* at 11, 12).

Herron's process for dealing with harassment complaints and complying with the policy is straightforward. Herron receives employee allegations of harassment, conducts an investigation with the parties, and tries to find out exactly what happened. (Herron Dep. at 11). After the investigation, if a problem is perceived, she attempts to make sure the problem is solved, either by correction or termination. (*Id.*).

Herron acknowledged that she received "two or three" verbal complaints from Green regarding Golson. (Herron Dep. at 12). She states that Green never made a formal complaint but did come to her office and explain his side of the situation. (*Id.*). Green admits never having lodged a written complaint but believes his verbal grievance was sufficient under company policy. (Green Dep. at 343-44). Herron also witnessed disagreements between Green and Golson. (Herron Dep. at 15). Herron, in response, called and informed Patty Meglich, the Human Resources Director, of the situation because both Green and Golson were "a little higher than" Herron. (*Id.* at 13, 14).

Herron states that she also received complaints regarding Green from Golson and others. (Herron Dep. at 13). Golson stated that the complaints indicated that Green failed to complete directives or tasks. (*Id.* at 13). Three females, Erma Bishop, Vicky Manderson, and Bonnie Lemmonds complained about Green. (*Id.* at 17, 18). Bishop claimed harassment and Manderson asserted a variety of issues. (*Id.*). With regard to Bishop's harassment allegation, Herron states that the complaint was not sexual in nature, but was verbal. (*Id.*).

Doug Gains also complained about Green, claiming that Green made sarcastic statements to employees and, in general, made employees feel uncomfortable. (Herron Depo. at 19).

13

Herron did not discuss the complaints with Green but did discuss them with the plant manager. (*Id.* at 22).

Herron confirms the plaintiff's contention that Golson would lose his temper. She states, "Not to say that [Golson] didn't lose his temper to some degree in the meetings, but the screaming and hollering" occurred behind closed doors. (Herron Dep. at 26). She stated nothing with regard to Golson's alleged loss of physical control. (*Id.*). Green states that he did not report every incident to Herron because Herron was present when many of the events transpired. (Green Dep. at 188). However, after several encounters, Green did go by Herron's office and ask her if there was anything she could do about the way Golson was treating people. (*Id.* at 187). Herron told Green that she had spoken with Patty Meglich, who said Green would have to take the matter up with Kevin Early or Kevin Albrecht (the General Manager and President of Carlisle in Crestline, Ohio). (Green Dep. at 343; Meglich Dep. at 70, 71).[7] Green claims that he fully complied with the harassment policy by notifying human resources and, despite his complaints, the harassment continued. (Green Dep. at 343).

### STANDARD OF REVIEW

The court will grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322. The moving party bears the initial burden of proof in a summary judgment motion. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11ᵗʰ Cir. 1991). Satisfaction of the initial burden shifts the burden to the

---

[7] Meglich's deposition is found at document 49, exhibit 5.

14

nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. *Clark,* 929 F.2d at 608. If a fact might affect the outcome of the case, it is material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248.

## DISCUSSION

### Negligence and/or Wantonness Claim

Count one of the plaintiff's complaint avers that the defendant's conduct constitutes negligence and/or wantonness. As noted by both parties, a claim of negligence is sufficient to avoid summary judgment when evidence is submitted illustrating a duty, a breach of that duty, causation, and damage to the plaintiff. *AALAR, LTD., Inc. v. Francis,* 716 So. 2d 1141 (Ala. 1998).

On the first issue, whether the defendant owed the plaintiff a duty, the plaintiff cites *Smitherman v. McCafferty,* 622 So. 2d 322 (Ala. 1993), for support that it does. *Smitherman* recognized the general proposition that a duty can be established due to a variety of factors, including public policy, social considerations and foreseeability of harm to a plaintiff. *Smitherman,* 622 So. 2d at 324. *See also Armstrong Business Services, Inc.,* 817 So. 2d 665, 679 (Ala. 2001). As best this court can discern from the pleadings, the plaintiff asserts that the defendant owed him a duty to provide a work environment safe from emotional and psychological harassment. None of the cases cited by the parties are dispositive of the issue of whether such a duty exists in the usual employment situation.

The Alabama Supreme Court has stated that an employer does have a responsibility in the ususal work setting. *Gordon v. Davis,* 585 So. 2d 893, 895 (Ala. 1991) (*citing Hill v. Metal Reclamation, Inc.,* 348 So. 2d 493, 494 (Ala. 1977). Specifically, the Court stated:

15

> Under the common law, an employer is under a duty to supply the employee with a reasonably safe place to work. *Woodward Iron Co. v. Craig,* 256 Ala. 37, 53 So. 2d 586 (1951); *Hardy v. City of Dothan,* 234 Ala. 664, 176 So. 449 (1937). He is held to that degree of care which reasonable and prudent men exercise in their own affairs, or the care and diligence which a man of ordinary care and prudence would exercise for his own protection, or the protection of his property. *Williams v. Anniston Electric & Gas Co.,* 164 Ala. 84, 51 So. 385 (1909). Accordingly, it is the duty of the employer to exercise reasonable care to warn the employee of any risk of harm and to acquaint him with any dangerous features of the equipment, premises, or procedures with which he works. *Gentry v. Swann Chemical Co.,* 234 Ala. 313, 174 So. 530 (1937). This includes the duty to take reasonable steps, when viewed in relation to the degree of the risk, to guard against injury to the employee from that risk. *Johnson v. Montgomery Baptist Hospital,* 295 Ala. 250, 326 So. 2d 738 (1976).

*Gordon,* 585 So. 2d at 895 (citing *Hill,* 348 So. 2d at 494). However, reviewing *Gordon* and the other cases cited by the plaintiff, it is clear that the duty involves situations other than that presented herein. In *Gordon,* the issue was not the nature of the duty, but whether or not the plaintiff was an independent contractor, who would be owed no legal duty. *Gordon,* 585 So. 2d at 895. The cases cited in the above quotation involved physical injuries that were precipitated by physical contact with someone or something or that were precipitated by environmental conditions (*Craig* (wrongful death claim premised on common law duty to provide a reasonably safe place in which to work); *Hardy,* (wrongful death due to worn insulation and improper stringing and maintenance); *Williams,* (wrongful death due to electrical current); *Gentry,* (injuries associated with the particular nature of the work; *Johnson* (movement of a patient that resulted in injury to a third party); *Hill* (injuries associated with the process involved in the work)).

The plaintiff also cites the court to *Yawn v. Southern Railway Company,* 591 F.2d 312 (5th Cir. 1979) and *Lancaster v. Norfolk & Western Railway Co.,* 773 F.2d 807 (7th Cir. 1985), in support of his claim that the defendant owes a duty to provide a safe workplace. These cases are inapposite. In *Yawn,* the plaintiffs brought a state court Federal Employer's Liability Act

16

("FELA") claim against the defendant premised on its negligence in failing to provide them with adequate help and time to do their clerical work. As a result of the defendant's negligence, the plaintiffs asserted that the defendant was responsible for their physical pain, mental anguish, and gastrointestinal disturbances. *Id.*, 591 F.2d at 314. The case was removed to the federal court and the plaintiffs filed a motion to remand, which was denied. On appeal, the issue was whether FELA suits filed in state court are nonremovable. *Id.* The court concluded that they are nonremovable and directed that the case be remanded. In deciding the case, the court recognized that the Act requires the railroads to provide employees with a reasonably safe place to work. *Id.* at 315. The court also noted that the Supreme Court has held that the FELA should be liberally construed to cover "any injury." *Id.* The court, however, specifically stated, "We need not consider at this time whether . . . the allegations of their complaints state a cause of action under the FELA[,] . . . the initial resolution of this question is entrusted to the Alabama State court . . . ." *Id.* at 316.

In *Lancaster*, the court affirmed a jury verdict in favor of the plaintiff, a mechanic who sued under the FELA for acts done to him by various supervisors for whom he worked. This case is distinguishable for many reasons. First, the facts are much more egregious:

> In 1975 he [(the plaintiff)] was a 30-year-old mechanic working in the railroad's locomotive shop in Decatur, Illinois. Lachrone, a short-tempered foreman in the shop who had once been disciplined for roughing up a worker, became angry at Lancaster and several other workers who Lachrone thought were soldiering on the job. After flipping over a table on which one of the workers (not Lancaster) was sleeping, and smashing a bench, Lachrone grabbed a broom handle, approached Lancaster in a menacing fashion, screamed at him for about 15 seconds, and shook the broomstick in his face. Lancaster bid out from Lachrone's supervision and complained about the incident to his union, but no action was taken.
>
> The incident upset Lancaster abnormally. He thought people were

17

following him, thought his phone was tapped, felt that the pressures of working for the railroad were too much, and went to Georgia to look for a new job. But after a couple of months his distress subsided and he went back to the old one. He was assigned to another foreman, Funderburk, who liked to "goose" workers, pull their hair, and hit them on the arms. He did these things to Lancaster, over the latter's protest. This behavior culminated in an incident in 1976 when Funderburk twice stuck his hand down the back of Lancaster's pants--once squeezing a buttock, the other time sticking his finger into Lancaster's anus. Lancaster became very upset, had trouble working, consulted a doctor, and on the doctor's advice took a leave of absence. The doctor diagnosed Lancaster as suffering from anxiety but it is unclear whether he told Lancaster his diagnosis.

Lancaster returned to work early in 1977 and worked uneventfully until an incident in 1979 involving another supervisor, Boyd. Lancaster and another worker were repairing a locomotive under Boyd's supervision when Boyd picked up a sledgehammer--though as a supervisor he was not supposed to wield a sledgehammer--and swung it at a pin that was stuck. The sledgehammer flew out of Boyd's hands when he completed his swing, and struck Lancaster. Although only bruised, Lancaster became very upset because he thought Boyd had thrown the sledgehammer at him . . . .

Two months later Lancaster found himself working under another hot-tempered supervisor, like Lachrone--Tynan, a burly six-footer, who while fondling a pickax handle told Lancaster that if he didn't "keep on the job and do it right, I'll put your name on it." About a week later Lancaster happened to deliver some papers to Tynan that were folded. Tynan said, "I told you not to fold the papers," to which Lancaster replied that he had not folded them, they had been folded when he had received them to give to Tynan. Tynan, enraged, charged Lancaster with pickax handle in hand . . . and struck the door frame over Lancaster's head with the handle. . . . Lancaster became even more upset than after the previous incidents. Indeed his mental condition deteriorated rapidly. His doctor referred him to a psychiatrist who, two weeks after the incident with Tynan, diagnosed Lancaster as schizophrenic. Lancaster quit work, tried unsuccessfully to return, and is expected never to be well enough to work again.

*Lancaster*, 773 F.2d at 811. Second, the plaintiff's claims in *Lancaster* were advanced under the

FELA, which specifically makes the railway liable for "the negligence of any of the officers,

agents, or employees of such carrier." *Id.* at 817 (quoting 45 U.S.C. § 51). The purpose of the

FELA is to "make the railroad liable for the negligence of its employees as well as for 'its own'

negligence in failing to provide adequate safety appliances and safe working conditions."

18

*Lancaster*, 773 F.2d at 817. It "does not create a cause of action for tortious harms brought about by acts that lack any physical contact or threat of physical contact – an act such as telling a man he's fired . . . ." *Id*. at 813. *Lancaster* recognized the holding in *Yawn*, but found its "analysis" unpersuasive:

> In holding that the railroad's conduct might be actionable under the FELA, the court pointed out correctly that a railroad worker who incurs physical or mental injury from unsafe working conditions has an FELA claim. *See* 591 F.2d at 317. But the complaint was not that working conditions were unsafe; it was that clerical employees had been given too much--not too dangerous--work to do. That is not our idea of an FELA claim; it has nothing to do with the security of the person from physical invasions or menaces.

*Lancaster*, 773 F.2d at 813.

After examining public policy, the social considerations and the foreseeability of harm in this case, the court is unwilling to find that the defendant was under a duty to act in the present circumstances. The facts herein do not justify under any of these considerations a finding that such a duty existed. To find such a duty would not be in the interests of public policy. To the contrary, to find such a requirement in this case would impose an unreasonable burden on the employer. Additionally, the court does not find any social considerations that warrant the application of such a legal duty under the present facts. Finally, the court finds that the "foreseeability of harm" in the present case does not reach the level of that seen or even contemplated in any of the cited cases. The crucial issue with regard to forseeability is whether Carlisle had reason to anticipate that harm would result from Golson's conduct. Green did make a number of complaints, as did others. Carlisle had knowledge of the situation. However, there is no evidence that Golson struck or otherwise physically assaulted any employee. Although this court does not want to condone Golson's conduct, it cannot under the circumstances impose a

19

legal duty on the defendant sufficient to support this claim.

Assuming, only for the sake of argument, that Carlisle had such a duty, the next question is whether the defendant breached that duty. At the outset, it is important to note the specific claims that are being advanced in support of the negligence and wantonness claims under the first count. The plaintiff asserts that the duty owed was to provide an environment safe from harassment and assault. Evidence of either would be sufficient to avoid summary judgment because either offense might constitute a breach of the defendant's duty to Green if it did not act in the face of such.

The plaintiff asserts that Golson's conduct amounts to a "campaign of harassment." (Green Dep. at 65). Harassment is defined in the criminal laws of the State of Alabama. Under Alabama Code § 13A-11-8(a), provides:

> (1) HARASSMENT - A person commits the crime of harassment if, with intent to harass, annoy, or alarm another person, he or she either:
>
>> a. Strikes, shoves, kicks, or otherwise touches a person or subjects him or her to physical harm.
>>
>> b. Directs abusive or obscene language or makes an obscene gesture toward another person.
>
> (2) For purposes of this section, harassment shall include a threat, verbal or nonverbal, made with the intent to carry out the threat, that would cause a reasonable person who is the target of the threat to fear for his or her safety.

Alabama Code § 13A-11-8 (2001 cum. supp.). If sufficient evidence has been proffered to support a claim under this provision, the breach element of a civil negligence/wantonness claim would be satisfied if the defendant had adequate notice of the potential harm. (*See Smitherman*, 622 So. 2d at 325, where Alabama Supreme Court recognized the right to a civil action that stems from a criminal act).

20

Green's complaints about Golson relate to the manner in which he conducted routine business matters and decisions. Golson's daily actions included verbal abuse, such as "losing control, temper, ranting and raving and getting so made (sic) that he would shake." (Doc. 48 at 8). As detailed above, Golson threatened to fire Green, he would yell at Green and other employees, and he would "rave" to the point that he would get so mad that he would shake. (Green Dep. at 172). Green states that the defendant "was negligent in allowing Golson to continually assault him and harass him" in this manner after he complained. (Doc. 48 at 5). He further states that he was "subjected to a series of confrontations, assaults and harrassments (sic)." (*Id*. at 6). As a result of the defendant's failure to act, he "suffered continual mental anguish and emotional stress." (*Id*. at 7).

Golson's outbursts regarding an intent to fire Green cannot reasonably be considered harassment or a breach of a duty owed to the plaintiff because Green was admittedly an at-will employee. Because the defendant and its agents, including Golson, had the right to fire Green for any reason (Green dep. at 48, 115, 116), it would be unreasonable to conclude that a statement of conditional intent to exercise a recognized contract right of termination can constitute harassment. Therefore, Golson's statement to Green that he would fire him for poor performance does not constitute actionable harassment.

The other incidents noted by Green are also insufficient as a matter of law. Green states that Golson ranted and raved, "blew up," or "raised hell" with regard to various issues at the plant. (*See generally* Doc. 49, Ex. 4, Def. Ex. 2). The outbursts involved whether to wash inserts, salary increases, plant shutdowns, break times, the number of temporaries, vacation time, production graphs, inventories and accounting, personnel, employee surveys, distributions,

21

customer service, and overtime. *Id.* All of the incidents of alleged verbal harassment involve legitimate business matters. Although the court is not impressed by Golson's handling of the various situations, his actions do not constitute actionable harassment under applicable Alabama law. *See* ALABAMA CODE § 13A-11-8.

The defendant cites the case of *B.E.S. v. State*, 629 So. 2d 761 (1993), to support its assertion that language is only abusive or obscene if it actually "provoke[d]" or "incite[d]" an immediate breach of the peace. (Doc. 44 at 9). However, that case distinguishes a breach-in-fact from a reasonable likelihood of breach, deferring to the latter. *B.E.S.*, 629 So. 2d at 764. Therefore, to constitute harassment, the "fighting words" need only be reasonably likely to "provoke" or "incite" a breach of the peace. *Id.* Even applying this lower criterion, the plaintiff still has failed to satisfy the element demonstrating a breach. To extend the definition of a "breach of duty" as proposed by the plaintiff, would insert the courts into the everyday activities of business in an unacceptable way. Such an intrusion in the daily activities of a business would be counterproductive. To find a breach of a duty in this case would be an improper interference with business activities and decision making without legal justification.

Because Golson's conduct does not amount to harassment warranting action by the defendant, the plaintiff's claim of a breach is dependent upon the court finding assaultive behavior that warranted a response from the defendant. The court does not find that Golson's actions rise to the level of an assault, warranting action by the defendant. Assault is defined as "an unlawful attempt to commit a battery, incomplete by reason of some intervening cause; or, to state it differently, to constitute an actionable assault there must be an intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in

22

the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented." *Western Union Tel. Co. v. Hill*, 150 So. 709, 710 (Ala. Civ. App. 1933). Words alone are never sufficient to maintain an action for assault but may be considered in conjunction with the actions of a party. *Holcombe v. Whitaker*, 318 So. 2d 289, 294 (Ala. 1975). Green's allegations are insufficient.

Green states that Golson's aggravation would manifest itself physically in a loss of control that caused an apprehension of an immediate attack. As already noted, Golson's agitation was manifested in his ranting and raving, his shaking, and his slamming of his fist into tables. (Green Dep. at 178). At no point does Green allege that Golson's shaking or slamming his fists into tables was a direct threat to him. Green simply alleges that he believed Golson might redirect his anger and that Green might be the target. However, Green offers no evidence to support the belief that Golson would do so and acknowledges that he did not perceive Golson as a physical threat. Green does state that in one instance "[he] was scared he [(Golson)] was fixing to hit me, yeah, and the reason being that, you know, if he hits me, then, you know, we both lose our jobs." (Green Dep. at 304). When asked why they would lose their jobs, Green stated that it was because he would "hit him back." (*Id.*). Golson's actions and Green's concerns, even regarding this instance, do not demonstrate "a well-founded fear of an imminent battery." *Western Union Tel. Co.*, 150 So. at 710. The evidence does not support a conclusion that he physically threatened or that he was forced to act defensively as a result of Golson's actions. Additionally, this appears to have occurred one time when they were discussing temporary positions. (Green Dep. at 303-04).

Under the circumstances, the court cannot find that there was an arguable breach of any

23

arguable duty by the defendant to overcome the motion for summary judgment on this claim.

## Negligent and/or Wanton Supervision and Training

Count two of the plaintiff's complaint alleges negligent and/or wanton employment,

supervision, and/or retention of Golson. In *Big B, Inc. v. Cottingham*, 634 So. 2d 999 (Ala.

1993), the Alabama Supreme Court recognized a cause of action for negligent or wanton

supervision and training that resulted in the tortuous conduct of an employee.

> In the master and servant relationship, the master is held responsible for his
> servant's incompetency when notice or knowledge, either actual or presumed, of
> such unfitness has been brought to him. Liability depends upon its being
> established by affirmative proof that such incompetency was actually known by
> the master or that, had he exercised due and proper diligence, he would have
> learned that which would charge him in the law with such knowledge.

*Id.* Wanton conduct is defined as follows:

> "[The] doing of some act or something with reckless indifference to the
> consequences of said act, or . . . a failure or omission to do something, with
> reckless indifference to the consequences of such failure or omission, that is, that
> the party acting or failing to act is conscious of his conduct, and even though
> without any actual intent to injure is aware from his knowledge of existing
> circumstances and conditions that his conduct would probably result in injury to
> another or in damage to his property.'"

> *Weatherly v. Hunter*, 510 So. 2d 151, 152 (Ala. 1987), quoting *W.T. Ratliff Co. v. Purvis*,
> 292 Ala. 171, 291 So. 2d 289 (1974).

*Armstrong Business Services*, 817 So. 2d at 679-80. "'Wanton supervision' requires that the

employer wantonly disregard its agent's incompetence." *Armstrong Business Services*, 817 So.

2d at 682.

Premised on the discussion in the last section, determining that Golson's conduct did not

amount to actionable harassment and assault, the court cannot find that there was notice on the

part of the defendant that Golson was unfit or incompetent to perform his job in a manner that

24

would not harm Green or any other employee.  It is clear that disagreements arose and that

Golson's conduct was inappropriate, even reprehensible, but this is insufficient to state a claim

for negligent or wanton training and supervision.  In the absence of any tortious conduct to ratify,

summary judgment is due to be granted for the defendant.

## OTHER CLAIMS

Green has not filed anything in opposition to the defendant's motion for summary

judgment on his claims of a breach of a duty of good faith (count three), breach of contract (count

four), misrepresentation (count five), and ratification (count six).  Thus, the court deems that the

plaintiff has abandoned these claims.  *Smith v. International Paper Co.*, 160 F. Supp. 2d 1335,

1347 (M.D. Ala. 2001) (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th

Cir.), *cert. denied*, 516 U.S. 817, 116 S. Ct. 74, 133 L. Ed. 2d 33 (1995)).  The defendant's

motion for summary judgment as to these claims is due to be granted and such claims are due to

be dismissed.  For the sake of completeness, however, the court will address the merits of the

same.

## BREACH OF DUTY OF GOOD FAITH

Count three alleges a breach of the duty of good faith in the employment relationship the

defendant had with plaintiff.  In *American Cast Iron Pipe Co. v. Williams*, 591 So. 2d 854 (Ala.

1991), the court stated the following when reviewing a trial court's jury instruction in an

employment wrongful discharge case:

> Although we agree that every contract does impose an obligation to act in good
> faith and to deal fairly (*see, e.g.*, § 7-1-203, Ala. Code 1975, for the obligation
> imposed in the commercial context), we have consistently refused to extend to the
> area of general contract law the tort of bad faith that we have recognized in the
> context of insurance policy cases. *Harrell v. Reynolds Metals Co.*, 495 So. 2d
> 1381 (Ala. 1986).  So, while the employment contract in this case does contain an

implied duty to act in good faith, it does not carry with it the duty imposed by law that we have found in the context of insurance cases. *See Kennedy Electric Co. v. Moore-Handley, Inc.*, 437 So. 2d 76 (Ala. 1983). Although the obligation to act in "good faith" arises as part of the contract in this case, its breach does not give rise to a bad-faith tort action. *Hoffman-La Roche, Inc. v. Campbell*, 512 So. 2d 725 (Ala. 1987). Therefore, we conclude that the trial court incorrectly instructed the jury by giving the bad faith charge.

*American Cast Iron Pipe Co.*, 591 So. 2d at 587.

Because the employment relationship in Alabama is "at will," it is terminable by either party at any time for any reason, (*Ex parte Michelin North America, Inc.*, 795 So. 2d 674, 677 (Ala. 2001)). Green, therefore, cannot establish a tort claim for a purported breach of a duty of good faith. Even if he succeeded in proving the existence of an employment contract, the *American Cast Iron Pipe* case makes it clear that such a claim does not exist under the present circumstances in Alabama. Summary judgment is due to be granted on this claim on the merits.

## BREACH OF CONTRACT

Count four avers a breach of contract premised on a failure to provide a work environment free of harassment. In *Eager Beaver Buick, Inc. v. Burt*, 503 So. 2d 819 (Ala. 1987), Burt was asked by his employer to engage in criminal activity. He refused and his employer began harassing him to the point that he was not able to perform his job. *Id.* at 822. This resulted in his resignation. *Id.* The defendant's insistence that he engage in criminal activity and its subsequent harassment and interference with his performance were deemed to be a breach of the plaintiff's employment contract and he was allowed to recover on his breach of contract claim. *Id.* In allowing the claim, the court stated, "Generally, contracting parties impliedly promise not to act so as to hinder, prevent, or make more burdensome the other's performance." *Id.* at 822.

It should first be noted that no contractual agreement existed between the parties.  Green stated that he was not relying on any promise of a harassment free environment in deciding whether to stay or leave.  He had no intention of leaving.  (Green Dep. at 437).  Additionally, the prohibited conduct in *Eager Beaver* was substantially more egregious than that alleged herein.  Carlisle did not demand that Green participate in illegal activity and Golson's conduct was not at the level of the "physical confrontation" in *Eager Beaver*.  *Id*. at 821-22.  Summary judgment is due to be granted on this claim.

## MISREPRESENTATION OF WORK ENVIRONMENT

Count five alleges misrepresentation, and reliance thereon, that the defendant would provide a harassment-free work environment.  Initially, the defendant attempts to limit the applicability of its harassment policy to sexual harassment.  (Doc. 44 at 21, 22).  However, even though the policy is labeled "SEXUAL HARASSMENT," the substance of the policy is much more inclusive.  (Def. Ex. J).  The policy statement provides: "Carlisle is committed to providing a harassment free work place.  No form of harassment on the job, including sexual harassment, or harassment due to race, national origin, physical conditions, or disability will be tolerated.  (*Id*. at CEP 0063).  It goes so far as to state its applicability to "any conduct in the work environment that is unwelcome."  *Id*. at 64.  Sexual harassment is but one of many forms of conduct covered by the policy.  The court does not find this argument persuasive.

In *Padgett v. Hughes*, 535 So. 2d 140 (Ala. 1988), the Supreme Court of Alabama outlined the elements of a fraud claim.  In order to establish a claim of fraud, the plaintiff must illustrate: (1) a false representation, (2) of a material fact, (3) reasonable reliance, and (4) damages.  *Id*. at 142.  Because this case concerns *promissory* fraud (a promise to act or not to

27

act in the future), two additional elements must be satisfied: (1) proof of a lack of intent to perform at the time of the promise, and (2) proof that the defendant intended to deceive the plaintiff. *Id.* The plaintiff has failed to meet his burden on this claim.

For the sake of argument, the court will assume that the plaintiff has satisfied the initial burden of showing a false representation. By way of example, the harassment policy promises an immediate investigation in the event of a complaint. (Def. Ex. J at CEP 0065). Yet no investigation was conducted. However, there is no evidence that the plaintiff relied upon any representation to his detriment. As noted above, in his deposition, Green stated:

> Q:   When you found out about this quote, unquote, "harassment free environment" that you've talked about, when that memo went up behind that glass was that one of the deciding factors in you staying there and continuing to work.
>
> A:   No. I had no intention of leaving.

(Green Dep. at 436-37). Because any purported misrepresentation did not influence Green's decision to stay with Carlisle and the relationship between the parties was completely governed by other employer-employee considerations, his claim of fraudulent misrepresentation cannot be maintained. Thus, under the facts before the court, it cannot be stated that the purported misrepresentation was material. *See Bank of Red Bay v. King*, 482 So. 2d 274, 282 (Ala. 1985) ("A 'material fact,' within the meaning of the Alabama fraud statutes, is a fact of such a nature as to induce action on the part of the complaining party, *Crigler v. Salac*, 438 So. 2d 1375 (Ala. 1983"). "It is not necessary that the misrepresentation be the sole inducement: "'[I]t is sufficient if it materially contributes and is of such a character that the [complaining party] would not have consummated the contract, had he known the falsity of the statement.'" *Marshall v. Crocker*, 387 So. 2d 176, 178 (Ala. 1980), quoting *Jordan & Sons v. Pickett*, 78 Ala. 331, 338 (1884).

28

Generally, the materiality of a given fact is a question for the jury. *Jim Walter Homes, Inc. v. Waldrop*, 448 So. 2d 301 (Ala. 1983); *Courtesy Ford Sales, Inc. v. Clark*, 425 So. 2d 1075 (Ala. 1983))." *Bank of Red Bay*, 482 So. 2d at 282. Although materiality is usually a jury issue, in view of the plaintiff's statement, the court must find an absence of materiality and reliance. Additionally, there is no proof of an intent to deceive. Summary judgment is appropriate on this claim as well.

## RATIFICATION OF HARASSING CONDUCT

Count six avers that the defendant ratified the harassing conduct. An employer can only be liable for the torts of an employee if (1) the acts were committed in the line and scope of the employees employment; (2) the acts were committed in furtherance of the business of the employer, or (3) the employer participated in, authorized or ratified the wrongful acts. *Doran v. Blount*, 707 So. 2d 643, 645 (Ala. 1997), citing *Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885, 889 (Ala. 1995). It is clear that under this count, that the plaintiff is traveling under the third prong. However, the claim is due to be dismissed because the plaintiff has not demonstrated any actionable tortious acts. Additionally, the facts do not show that the defendant ratified the conduct. In *Machen v. Childersburg BanCorporation, Inc.*, 761 So. 2d 981 (Ala. 1999), the court stated:

> "(1) [that her employer] had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted [  ] harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation."

*Machen*, 761 So. 2d at 985, *quoting Potts v. B E & K Construction Co.*, 604 So. 2d 398, 400 (Ala. 1992). The evidence does not show that the defendant knew or should have known that

29

judgment is due on this claim.

## CONCLUSION

The plaintiff in this case has failed to allege conduct on the part of Golson or the defendant that entitles him to relief. Golson's conduct, although not to be condoned, does not constitute actionable harassment or assault. Golson appears to have been rude in the way that he interacted with Green and other employees. However, acting as he did does not constitute tortious conduct. Golson's expression of his anger in physical manifestations, such as striking the table, is inappropriate, but it was not directed toward the plaintiff in such a way as to allow this court to find that it constituted an assault or harassment. Simply put, Green has not been the subject of acts that entitle him to legal relief. Accordingly, his claims in this action must be dismissed on the defendant's motion for summary judgment. The defendant's motion for oral argument is moot.

DONE, this _22nd_ day of July, 2002.

_____
**JOHN E. OTT**
United States Magistrate Judge

30